# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Matthew Hayden d/b/a Hayden's Services, LLC, individually and on behalf of all persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RB Global, Inc.; Rouse Services LLC; United Rentals, Inc.; Sunbelt Rentals, Inc.; HERC Rentals Inc.; H&E Equipment Services, Inc.; and Sunstate Equipment Co., LLC,<br><br>Defendants. | Case No: 3:25-cv-01059<br><br><br>**CLASS ACTION COMPLAINT JURY**<br><br>**TRIAL DEMANDED** |

Plaintiff Matthew Hayden d/b/a Hayden's Services, LLC ("Plaintiff") brings this civil antitrust action on behalf of itself and on behalf of a proposed Class of all persons and entities who rent construction equipment in the United States from any Defendant or from any of Defendants' co-conspirators beginning on at least March 31, 2021 and running through the present (the "Class Period"). Defendants in this action consist of RB Global, Inc. ("RB") and its wholly owned subsidiary Rouse Services LLC ("Rouse Services", and collectively with RB "Rouse"), as well as major construction equipment rental companies in this country: United Rentals Inc. ("United"), Sunbelt Rentals, Inc. ("Sunbelt"), HERC Rentals, Inc. and  HERC Holdings Inc. (collectively, "HERC"), H&E Equipment Services, Inc. ("H&E"), and Sunstate Equipment Co., LLC ("Sunstate") (collectively the "Rental Defendants").

## I.    INTRODUCTION

1.    This action arises from a horizontal price-fixing agreement through which through Defendants conspired to fix, maintain, and/or stabilize rental prices for rental equipment and tools used for construction, entertainment, and other industries ("Rental Equipment") during the Class Period.

2.    Through sustained efforts to buy and merge with hundreds of competitors, the Rental Defendants have consolidated and maintained their dominant position in the rental equipment market. Circa 2023, Defendants United and Sunbelt alone controlled 60% of the rental equipment market.

3.    Before 2011, the Rental Equipment industry was fragmented and characterized by price competition leading to lower prices for customers seeking to rent Rental Defendants' equipment. In 2010, a former CEO of Hertz Equipment Rental Corp (now HERC Rentals) called

2

for industry changes on the basis that the "pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted," due to "[p]oor rate management."[1]

4.      Recognizing that they could collectively increase pricing in the Rental Equipment market, the Rental Defendants engaged in a continuing horizontal agreement to leverage the power of analytics technology and effectuate higher rental rates for their equipment.

5.      Rental Defendants subsequently urged Rouse to develop a digital platform that could solve the "pricing" that Rental Defendants believed plagued the industry. Rouse now owns and operates Rouse Services, a digital platform that collects invoice-level transactional and inventory data for Rental Equipment and uses that data to calculate and disseminate to Rouse clients, including the Rental Defendants, a Rouse Rental Insights price ("RRI Price") for adoption in the market.

6.      Rouse collects invoice-level transactional data and equipment fleet snapshots from its clients, a mandatory condition of using Rouse Services. Indeed, the data managed and analyzed by Rouse represents over $65 billion in Rental Equipment fleet value, $28 billion in rental revenue, and $21 billion in annual sales transaction data, reflecting a substantial consolidation of market data. Rouse then uses that data to provide its clients, including Rental Defendants, daily reports of industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age, and other key performance indicators.

7.      While marketed as a way for Rental Defendants and co-conspirators to optimize their rental and utilization rates, Rouse Services in actuality offers Rental Equipment companies the opportunity to conspire and join a price-fixing cartel ("Rouse Cartel"). Defendants' scheme

---

[1] Dan Kaplan, *The Clock is Ticking on Rate Discipline*, RENTAL EQUIP. REGISTER (Sept. 1, 2010), https://www.rermag.com/business-technology/business-info-analysis/article/20937427/the-clock-is-ticking-on-rate-discipline (last visited May 26, 2025).

has succeeded to great effect. As a result of their participation in the Rouse Cartel, the Rental Defendants have experienced record profits and skyrocketing share prices.

8.     Industry executives openly discuss their "disciplined" market—a market in which the Rental Defendants have agreed to eliminate price competition, allowing them to reap the benefits of higher prices and margins.

9.     This "disciplined" lack of pricing competition has been to the direct detriment of Plaintiff and members of the Class and has caused them to pay supra-competitive prices for Rental Equipment during the Class Period.

10.     Rouse and the Rental Defendants have violated and continue to violate U.S. antitrust laws. Instead of setting their rates independently, the Rental Defendants, who control much of the U.S. Rental Equipment market, outsource rate-setting to Rouse as a common entity. By acting collectively through Rouse, the Rental Defendants eliminate price competition between themselves.

## II.     JURISDICTION AND VENUE

11.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and members of the Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing

business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this district. For example, Defendant United Rentals maintains its corporate headquarters in Stamford, Connecticut.

14.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) rented and/or delivered substantial quantities of Rental Equipment throughout the United States, including in this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons and businesses residing in, located in, or doing business throughout the United States, including this District.

15.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

16.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III. PARTIES

**Plaintiff**

17.     Plaintiff Matthew Hayden d/b/a Hayden's Services, LLC is a is a landscaping and hardscaping company incorporated and headquartered in Maryland. Plaintiff provides homeowners in Maryland with construction services to build outdoor living spaces, including pergolas, decks, and patios. Plaintiff rented Rental Equipment directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Defendants**

18.     Defendant RB Global, Inc. is a public company, traded on the Toronto and New York Stock Exchanges, that is legally domiciled in Canada and with U.S. headquarters located at 2 Westbrook Corporate Center, Suite #1000, Westchester, Illinois 60154.

19.     Defendant Rouse Services LLC is a wholly owned subsidiary of RB Global. Rouse maintains its headquarters in Beverly Hills, California. RB Global acquired Rouse in 2020 for $275 million.

20.     Defendant United Rentals, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Stamford, Connecticut. United Rentals is the largest equipment rental company in the world, operating over 1,400 retail locations across North America.

21.     Defendant Sunbelt Rentals, Inc. is incorporated in North Carolina and maintains its principal place of business in Fort Mill, South Carolina. Sunbelt Rentals is the second largest equipment rental company in the United States and Sunbelt Rentals reported $9.3 billion in revenue from its U.S. business in 2024. Its U.S. fleet is worth over $15 billion.

22.     Sunbelt Rentals is a division or subsidiary of Ashtead Group PLC. Ashtead Group PLC maintains its headquarters at 100 Cheapside, London EC2V 6DT, United Kingdon. Ashtead PLC does business as and operates under the brand name of Sunbelt Rentals, doing business in the United States, Canada, and the United Kingdom. Ashtead Group PLC is publicly traded on the London Stock Exchange.

23.     Defendants HERC Rentals Inc. and HERC Holdings Inc. are public companies incorporated under the laws of Delaware with their principal place of business in Bonita Springs,

Florida. The majority of HERC Rentals' business is from equipment rental. HERC also sells used rental equipment and new equipment, parts, and supplies. HERC Rentals was formerly known as Hertz Equipment Rental Corp. HERC has over 451 locations in the U.S. and Canada. Its fleet represents a total original equipment cost ("OEC") of $7 billion. HERC reports that its total revenue reached a record $3.6 billion in 2024.

24.     Defendant H&E Equipment Services is a publicly traded company incorporated in Delaware with its principal place of business in Baton Rouge, Louisiana. H&E Equipment operates a fleet of rental equipment including aerial work platforms, earthmoving, material handling, and other general and specialty lines. H&E Rentals had 2024 revenues over $1.5 billion. Equipment rentals provided over half of its gross profit.

25.     Defendant Sunstate Equipment Co., LLC is incorporated in Delaware and has its principal place of business in Phoenix, Arizona. Sunstate Equipment is one of the largest rental equipment companies in the U.S with approximately 100 branches in 16 states. Sunstate Equipment is a wholly-owned subsidiary of Sumitomo Corporation Group, which is publicly traded on the Tokyo Stock Exchange and listed through an American Depositary Receipt on the New York Stock Exchange.

**Unnamed Conspirators**

26.     Various co-conspirators, including rental equipment companies and other industry participants, also participate in the price-fixing conspiracy along with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the co-conspirators are named as Defendants in this Complaint.

27.     The anticompetitive and unlawful acts alleged against Defendants in this complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

28.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

29.     Defendants are additionally liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Rouse and Rental Defendants Formed the Rouse Cartel.

30.     Before Rouse offered Rouse Services, rental companies conducted independent analysis of costs, supply, and demand to determine the price determine the price for their Rental Equipment.

31.     The development of Rouse's platform and the Rouse Cartel completely upended this pricing model as it is designed to increase Rental Equipment rates across the industry.

32.     Rouse Cartel members agree to delegate their pricing for Rental Equipment to Rouse's RRI Price and to share all of their competitively sensitive data regarding their pricing and utilization with co-conspirators and Rouse. The joint delegation and anticompetitive information exchange has led to Rouse's coordination of construction equipment rental behavior and prices.

33.    Rouse's predecessor began as Ritchie Brothers, a Canadian auction company which began transitioning into an information services company around 2000. In the late 2000s, several of Rouse's clients, including Rental Defendants HERC Rentals, Sunbelt Rentals, and United Rentals, approached and asked Rouse to create a platform to manage Rental Equipment. These clients believe that consolidating competitively sensitive data would increase "visibility" for all.

34.    Rouse advertises its revenue management software (including its RRI Price) to construction companies as a means of increasing prices above those available in a competitive market and avoiding the risk of relying "solely on limited data and anecdotal information" and salespeople in making rental rate and fleet utilization decisions. These expressions are code for facilitating price-fixing through the pooling of competitively sensitive information by those competitors. Rouse's benchmarking and appraisal services business model resembles those the US antitrust regulators have been scrutinizing for algorithmic intermediaries' anticompetitive activities.

35.    In 2010, Dan Kaplan, a former president of HERC Rental's predecessor company, Hertz Equipment Rental Corporation, argued that rental companies were engaged in aggressive competition resulting in their race to the bottom. To Kaplan it was "difficult to reconcile with the poor discipline shown in managing rates" and he suggested companies should "walk the line between adding fleet capacity to meet demand, and dealing with the impact of capacity on rate recovery."[2]

---

[2] Dan Kaplan, *The Clock is Ticking on Rate Discipline*, Rental Equip. Register (Sept. 1, 2010), https://www.rermag.com/business-technology/business-info-analysis/article/20937427/the-clock-is-ticking-on-rate-discipline (last visited May 26, 2025).

36.    Other industry leaders agreed that the absence of price "discipline" and aggressive competition hurt the industry as a whole, stating that "continually slashing rates and using rate discounting as a method to sell your business means selling the industry short."[3]

37.    In 2011, the American Rental Association ("ARA") published—in collaboration with Rouse and other major rental companies—standardized rental metrics for the industry, called the ARA Rental Market Metrics, setting industry standards for such measurements as physical utilization, dollar utilization, and fleet age. Many of the metrics pertained to "fleet efficiency and utilization."

38.    Just one month later, Rouse's equipment rental pricing service, "Rouse Analytics" and later "Rouse Rental Insights", including the RRI Price went live with Defendants HERC Rentals (then Hertz Equipment Rental Corp.), H&E Equipment, and United Rentals as members. Later in 2011, Rouse invited additional Rental Equipment companies—including Defendants Sunstate and Sunbelt—to join the Rouse Cartel and begin sharing their competitively sensitive information. Since then, Rouse collected, and these Defendants began pooling their competitively sensitive pricing data.

39.    By 2015, Rouse had over 50 rental equipment company clients participating in its "Rental Metrics Benchmark Service," which included the collective RRI Price created through the exchange of the Rental Defendants' and other rental companies' competitively sensitive information. To increase the number of co-conspirators and data obtained from them, Rouse

---

[3] Michael Roth, *Rental Rates Endanger Progress of Rental Industry: The comments and emails we have seen in regard to Dan Kaplan's column last month on the rental rate suicide this industry seems determined to commit shows*, RER MAG. (Oct. 1, 2010), https://www.rermag.com/business-technology/business-infoanalysis/article/20942889/rental-rates-endanger-progress-of-rental-industry (last visited May 27, 2025).

initially offered a "free" access where it gave participants monthly updates on market conditions in exchange for their data. Rouse noted at the time:

> The rapid growth of our Rental Metrics Benchmark Service demonstrates how valuable this information is to rental companies, and we're looking forward to additional growth here in the U.S. and internationally.[4]

40.     By 2020, Rouse's RRI Price had become ubiquitous within the industry and created a feedback loop with widespread market effects. The more companies that joined the Rouse Cartel, the more that rental companies became swayed by the efficacy of adopting Rouse's pricing recommendations.

41.     RB Global, then known as Ritchie Brothers, acquired Rouse in late 2020. At the time, Ritchie Brothers operated physical and online auctions, connecting buyers and sellers of used equipment in the construction, agriculture, mining, and transportation sectors.

42.     The Rouse acquisition enabled Ritchie Brothers to expand its customer base and offer rental companies analytics to enhance their rental operations and their ability to buy and sell equipment through Ritchie Brothers' network. For Rouse, joining Ritchie Brothers allowed integration of Rouse's advanced data analytics capabilities into Ritchie Brothers' data services, thereby improving Rouse's RRI program.

---

[4] *Rouse Analytics Rental Benchmark Service Tops 50 Participants*, RER MAG. (Feb. 17, 2015), https://www.rermag.com/news-analysis/headline-news/article/20950099/rouse-analytics-rental-benchmark-service-tops-50-participants (last visited May 27, 2025.

43.     By 2024, over 400 rental companies across North America used RRI. [5] This includes all 10 of the top 10 rental companies, and 70 of the top 100, as measured by RER.[6] Rouse has stated that its database covers at least 60% of the North American rental equipment market. As a result, over half of the rental equipment market adopts Rouse's RRI Price and contributes their competitively sensitive information to Rouse.

44.     Rouse's marketing invites concerted action among rental companies to fix and raise prices. Rouse and the Rental Defendants knew that successfully raising and fixing prices for the entire industry needed a collective shift towards participation in the Rouse Cartel. Rental companies use Rouse only because they know that their competitors are doing the same and that through coordination with their competitors, they could also raise rental prices to supra-competitive levels without suffering competitive harm.

45.     Other rental companies accepted Rouse's advertised invitation to trade their competitively sensitive information for the ability to charge increased rental rates without fear of being undercut by their competitors.

46.     As Rouse regularly boasts, over 400 of the nation's equipment rental companies have accepted Rouse's invitation to participate in concerted action with respect to rental prices.[7]

47.     Rental companies accept Rouse's invitation to collude by providing Rouse with their competitively sensitive information. As Rouse states on its website, "[w]e pull data directly

---

[5] Christina Kneitz, *Rouse & SmartEquip Clients Dominate Top Rental Company Lists*, ROUSE (Sept. 12, 2024), https://www.rouseservices.com/rouse-smartequip-clients-dominate-top-rental-company-lists/ (last visited May 27, 2025).

[6] *See, e.g.*, Michael Roth, *The 2023 RER 100 Demand is the Driver*, RER Mag. (April/May 2023) at https://secure.viewer.zmags.com/publication/9ca3887d#/9ca3887d/20 (last visited May 27, 2025).

[7] *Rental Insights – Rouse*, Rouse, https://www.rouseservices.com/solutions/rental-insights/ (last visited May 27, 2025)

from our clients' systems to ensure our rate benchmarks are based on actual rental invoices billed to customers, not list rates or quoted rates."[8] Rouse also admits to "provid[ing] clients with comparisons of the rental rates, utilization, and other key performance metrics to industry benchmarks by Cat Class specific to each market they operate in."[9]

48.    Rental companies share this data with Rouse because they know that Rouse will use it to help them and their co-conspirators fix and raise prices. They share competitively sensitive information so they can benefit from the data their competitors likewise provide to Rouse.

49.    Rental companies also demonstrate their acceptance of Rouse's invitation to participate in the Cartel by adhering to RRI Price determinations and further demonstrate their acceptance of Rouse's invitation to collude by tracking and rewarding their sales representatives who comply with Rouse's RRI Price.

50.    On information and belief, Rouse has entered into contracts for the exchange of competitively sensitive information with hundreds of Rental Equipment companies, including each of the Rental Defendants, evidencing the price-fixing conspiracy described herein.

51.    These agreements all expressly contemplate that the rental company will share competitively sensitive information with its rivals through Rouse, have access to Rouse's database and RRI Pricing, which pools competitively sensitive information from rivals; and use Rouse's RRI pricing.

---

[8] *Id.*

[9] *Id.*

52.     Rouse advertises that its pricing information is based on data from over 400 companies, representing over $115 billion of fleet value and $49 billion of rental revenue.[10] Rouse highlights that this data is made up of actual rental invoices sent to customers rather than quoted rates, enabling rental companies to make the "most profitable decisions" possible.[11] Rouse reportedly claims it offers the only system that provides this level of accuracy in "benchmarking" in the equipment rental industry and claims to be the exclusive source for benchmark rate and utilization data for the industry.[12]

53.     Brad Spitzer, Rouse's Director of Client Services, reportedly gave a November 22, 2024 podcast.[13] The interviewer called it "impressive" that Rouse had data of not some, but all of the national rental companies. Spitzer replied that it "helps out the entire industry really by allowing people to have more visibility into their performance and their market and react and make better decisions."[14] He also said to train salespeople to "not always listen to their customers and listen to the data and the market around them."[15]

54.     Rouse's private statements to rental companies also confirm that concerted action is the point of the RRI business model. Not only does Rouse collect competitively sensitive information from all its rental company clients, including the Rental Defendants—which it uses to

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Brad Pitzer: Rental and Used Sales Trends*, IEDA PODCAST (Nov. 22, 2024).

[14] *Id.*

[15] *Id.*

set RRI Prices across rental companies—it also acts as a go-between for its clients, explicitly telling them who else is part of the Rouse Cartel and which pricing/utilization strategies they are employing, all so Rouse can instruct each rental company, including the Rental Defendants, to implement similar strategies and moves.

55.    Rouse also engages in ongoing marketing efforts and training with its clients, including the Rental Defendants, on a regular basis and frequently updates rental companies on new developments and trains their sales and analytics staff to use Rouse and the RRI Price. This includes encouraging the use of tools that ensure sales representatives are complying with the RRI Price. Rouse also maintains a private online portal for customers, through which it can communicate and advise rental companies on RRI implementation.

**B.  Rouse Uses Client Data to Calculate the RRI Price.**

56.    Through its Rental Metrics Benchmark Service, Rouse collects invoice level transaction data and nightly fleet snapshots from participating rental companies and reports industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age and other key performance metrics at a local market level. Participating rental companies receive an initial comparison of their rental rates, utilization, and other key performance metrics to local benchmarks. They receive a summary level comparison of their rental rates and other key performance metrics to local market benchmarks every month at no charge and then have the option to purchase more detailed reporting.

57.    To create the RRI Price, Rouse requires its clients to agree to submit every line item of every invoice the rental company charges its customers every day, along with real-time utilization information on their entire fleet. Equipment rental invoices include competitively

sensitive information regarding utilization, fleet age and value, duration terms, and most importantly, pricing, all of which is non-public information.

58.    This competitively sensitive data is automatically collected through Rouse's platform on a daily basis which Rouse then collects, collates and conforms to ARA rental market metrics.

59.    Rouse then uses a proprietary, common formula to calculate the RRI Price for its rental company clients based on the pooled competitively sensitive information data, Rouse's assessment of seasonality of demand, and Rouse's view of market conditions. Rouse provides users with the same RRI Prices based on the competitors' pooled competitively sensitive information and Rouse's common formula.

60.    Rouse offers RRI Prices by category and class (which it refers to as "Cat Class") and specific to a client's local market. Rouse also provides comparisons of a client's rental rates compared to its competitors on monthly, weekly, and daily rates. Rouse also provides clients with "benchmarks" in "ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus [their] competition."

61.    Rouse continuously updates its RRI Prices as data comes in, offering High, Medium, and Low RRI Price for each rental. Rouse customers are also shown how their prices compare to the RRI Price.

62.    Rouse discourages price competition by enabling clients to set prices are or above the reported RRI price, thereby creating a upward pressure on rental prices from all of its clients.

63.    Rouse attempts to divert attention away from this anticompetitive conduct by referring to the RRI price as a "benchmark," when in reality it is a tool for Rental Defendants to coordinate and implement the price fixing conspiracy. Instead of using the RRI price as a tool to

measure past performance, Rental Defendants use it to set a common price to avoid price competition.

64.    One article touting Rouse's "benchmark" service explains how specific the pricing data it provides, which allows competitors to know exactly how to price their products:

> It's one thing to tell your managers and sales staff they need to bring their rates up, but quite another to tell them with certainty they are 12-percent below average for the market in generators, 14-percent below market average in mid-sized skid-steer loaders, and 17- percent below market average in 19-foot scissor lifts and tell them the exact amount of the average rate.[16]

65.    The Rental Defendants were aware that their competitors also contributed competitively sensitive data to Rouse, and that Rouse collected and provided that data to Rental Defendants for them to illicitly increase prices to supra-competitive levels.

66.    It is against each Rental Defendants self-interest to allow Rouse to collect and share its competitively sensitive data absent collusion. It is only in Rental Defendants self-interest to do is if they knew that they would receive the benefit of their competitors' commercially sensitive data in pricing.

**C.  Rental Companies Use the RRI Price to Implement Their Price-Fixing Conspiracy.**

67.    The Rental Defendants use the Rouse RRI Price to set their own rental prices and adjust it based upon the market condition data supplied by Rouse.

68.    Rouse executive Gary McCardle explained that a customer can view their own information through various means:

> So at any moment, if a rental company wants to know how it is doing with 19-foot scissorlifts in Birmingham compared to the competition, or

---

[16] *Rouse Asset Services offers Rental Metrics Benchmark Service*, RER Mag. (Oct. 1, 2012), at https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offersrental-metrics-benchmark-service (last visited May 27, 2025).

17

air compressors in Memphis or any piece of equipment in any covered market for any time period, all it takes is a few keystrokes. A company can, also with a few keystrokes, determine how it is faring in physical or dollar utilization, rates, or fleet age compared to its competitors in markets covered by Rouse. It can also determine how it is faring in ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus its competition.[17]

69.    An executive at Sunbelt touted the benefits that Rouse's products brought to it: "We leverage Rouse in a number of ways really... rate and utilization are the most important ways . . . . [T]he most valuable thing Rouse helps us with understanding where we sit in the marketplace[,] whether we are overperforming or underperforming to allow us to make adjustments."[18]

70.    Rouse also partners with companies in other segments of the Rental Equipment market to have the Rouse RRI integrated in their platforms including, but not limited to: Alert Superior Rental Software, CDKGlobal, Emphasys, Equipment Business Software Solutions, FameRental, FocalPoint Software, Integrated Rental, InTempo, Point of Rental Software, Texada, Wynne, integraSoft, and Flyntlok.[19]

71.    This ensures that the RRI pricing is accessible to as many companies as possible in the market, including small and mid-sized rental companies, which allows for easy expansion, monitoring, and enforcement of the RRI pricing.

72.    Additionally, Rouse meets with and advises clients, including Rental Defendants, to provide guidance on how to maximize profits based on the RRI Price and other tools provided by Rouse Services.

---

[17] *Id.*

[18] Rouse and Sunbelt Rentals – A Strong Partnership, https://www.youtube.com/watch?v=l7KmTzc29NQ.

[19] *Rental Insights – Rouse*, ROUSE, https://www.rouseservices.com/solutions/rental-insights/ (last visited May 27, 2025).

73.    Through Rouse's platform, Rouse clients compare precise details of their business to their competitors and the RRI price to maximize pricing.  By directly comparing those details, Rouse clients are able police adherence to the unlawful conspiracy by ensuring that they are charging as much as their competitors relative to the RRI price.

74.    Examples of the information and key metrics available to view in Rouses' platform include: rental rates, rental rate change, physical utilization, financial utilization, fleet age, revenue distribution, and rental growth. This data is provided for each class of rental equipment a rental company offers. Rouse additionally provides pricing comparisons at individual customer level as compared to the RRI price on all key reported metrics.

75.    By allowing all Rouse clients, including Rental Defendants, to see actual prices charged in the market relative to the RRI Price, Rouse directly discourages price competition and encourages clients to charge the RRI price or higher for their equipment.

76.    Rouse Services also consolidates and compares detailed information on a client's sales teams, including a comparison of each sales representative's performance against the RRI price, including the precise difference between the representative's actual sales and what Rouse thinks the representative should be selling. Rouse additionally provides summary metrics and comparisons at the individual sales representative level.

77.    By disseminating this feature, Rouse encourages clients to police their salespeople to determine if they are performing as Rouse expects relative to the RRI price. Members of the Rouse Cartel have stated that they set their prices at the recommended RRI price 90% of the time.

78.    Through use of Rouse Services and adoption of the RRI price, Rental Defendants have seen record profits. In 2019, "[t]he new RER 100 totaled $25.2 billion, a record total for the

listing, and a 15-percent increase over 2018's $21.9 billion."[20] As of 2021, the RER 100 list of the largest rental companies included sixty-three (63) companies that are Rouse customers, and made up 8 of the top 10.[21] According to the RER 100 lists, Defendant United Rentals' total rental volume in 2021 increased 14.9% over 2020, and it saw another 23.3% increase in 2022. Defendant Sunbelt Rentals' total rental volume increased 15.4% over 2021, which increased another 26.7% in 2022. Defendant HERC saw a 23.8% increase in 2021, and 33.6% in 2022. Defendant H&E saw increases of 10.1% and 31%, respectively.[22]

79.    Rental Defendants, Rouse, and their co-conspirators have violated and continue to violate U.S. antitrust laws. The Rental Defendants, who comprise a majority of the largest rental companies and control an oversized portion of the construction rental market, collaborate to set their prices in concert with each other by outsourcing pricing responsibilities to Rouse. As a result, Rental Defendants, Rouse, and their co-conspirators have eliminated price competition between and among themselves and artificially increased prices in the Rental Equipment market.

**D. The Industry's Structure Supports the Existence of a Conspiracy.**

80.    Certain market characteristics, or "plus factors" make collusion more likely, for example by making price-fixing more efficient or more profitable.

    a.    High barriers to entry;

    b.    High barriers to exit;

---

[20] Michael Roth, *The 2019 RER 100 Tops $25 Billion: The RER 100 enjoyed a 15-percent rental revenue jump in a record year for the rental elite*, Rental Equipment Register (May 11, 2019), at https://www.rermag.com/rentalnews/article/20954702/the-2019-rer-100-tops-25-billion.

[21] *Id.*

[22] *See* Michael Roth, *A Rising Tide for the RER 100*, RER MAG. (May 2022) https://secure.viewer.zmags.com/publication/c5f1bfef#/c5f1bfef/14 (last visited May 27, 2025); Michael Roth, *The 2023 RER 100 Demand is the Driver*, RER MAG. (April/May 2023) at https://secure.viewer.zmags.com/publication/9ca3887d#/9ca3887d/20 (last visited May 27, 2025).

    c.   Inelastic consumer demand;

    d.   Market concentration;

    e.   Relative product fungibility;

    f.   Exchanges of competitively sensitive information among horizontal competitors; and

    g.   Numerous opportunities to collude at events and through trade associations.

81.    **Barriers to Entry and Exit.** Capital requirements are higher for the larger and more expensive equipment rented out by rental equipment companies, including Rental Defendants. Indeed, Rental Defendants each control and rent several billion dollars worth of equipment. Further, the development of a strong customer base that could compete with Rental Defendants and storage and maintenance costs for large construction equipment are barriers to entry. The exorbitant expenses required to enter the market also make it incredibly difficult to exit, as companies cannot feasibly write off those expenses.

82.    **Inelasticity.** The demand for Rental Equipment is relatively inelastic. The only realistic alternative to renting is buying, which, as previously described, is not a financially feasible option for most contractors. Therefore, no reasonable substitutes exist to discipline cartel pricing.

83.    **Market Concentration.**  Rental Defendants United Rentals, Sunbelt Rentals, HERC Rentals, H&E Equipment, and Sunstate Equipment, have grown substantially through mergers and acquisitions and control a substantial portion of the Rental Equipment market. The market is dominated by the ten largest companies, all of which are in the Rouse Cartel.

84.    **Relative Product Fungibility.** Construction equipment is relatively fungible as there are not significant differences between different brands of the same product, and indeed Rouse prices equipment based on similar "Cat Classes". Rental company customers rarely have

any additional information that distinguish one piece of equipment from another when deciding which equipment to rent. The industry-wide standardized accounting and performance metrics created by ARA and Rouse further.

85.    **Sharing of Competitively Sensitive Information.** Reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is and should be a "super plus factor" that leads to a strong inference of active collusion. As described herein, Rouse collects invoice-level transaction data and nightly fleet snapshots from participating rental companies and reports at least industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age, and other key performance metrics at a local market level.

86.    **Collusion Opportunities.**  Trade associations offer Rouse and participating rental companies opportunities to conspire. For example, Rouse and the Rental Defendants are all members of the ARA, which offers training, consumer research, and various networking opportunities. Rouse further sponsors various trade shows including the ARA Rental Show.

### III. IMPACT ON INTERSTATE TRADE AND COMMERCE

87.    Beginning at least as early as March 31, 2021, and continuing until the present, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act. During the Class Period, the Rental Defendants rented substantial quantities of Rental Equipment in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where the Rental Defendants provided their equipment rentals.

88.    Defendants' conspiracy had a direct, substantial, intended, and foreseeable impact on interstate commerce in the United States and its territories as the Defendants are a part of a multi-billion-dollar market that continues to grow. The Rental Defendants own facilities and equipment fleets in the United States and rented Rental Equipment in the United States.

Furthermore, Defendants knew their rental services would enter the U.S. stream of commerce and would affect United States commerce including harm to Plaintiff and the proposed Class in the payment of supra-competitive prices for Rental Equipment.

89.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Rental Equipment in the United States.

## IV. ANTITRUST INJURY

90.     The Rouse Cartel directly damaged and continues to damage Plaintiff's business and restrains competition in the relevant market. Defendants' antitrust conspiracy had the following effects, among others:

     a.  Price competition has been restrained or eliminated with respect to the pricing of Rental Equipment;

     b.  Prices of Rental Equipment have been fixed, raised, maintained, or stabilized at artificially inflated levels;

     c.  Renters of Rental Equipment have been deprived of the benefits of free and open competition; and,

     d.  Plaintiff and other Class members have paid higher and artificially inflated prices for Rental Equipment as a direct, foreseeable, and proximate result of Defendants' conduct.

91.     The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of Rental Equipment.

92.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

93.     But for Defendants' conspiracy, Plaintiff and members of the proposed Class would have paid less for Rental Equipment.

94.     The precise amount of the overcharge impacting the prices of Rental Equipment paid by Plaintiff and the Class can be measured and quantified using well-accepted economic models.

95.     By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the U.S.

96.     By reason of the alleged violations of the antitrust laws, Plaintiff and the other members of the Class have sustained injury to their business or property, having paid higher prices for Rental Equipment than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiff and the other members of the Class have suffered damages in an amount presently undetermined. However, the precise amount of overcharge affecting the prices of Rental Equipment can be measured and quantified using well-accepted economic models. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish, remedy, and prevent.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

97.     Plaintiff's and other Class members' rentals of Rental Equipment within four years prior to filing this Complaint are not barred by the applicable four-year statute of limitations. The statutes are not required to be tolled for these claims to be actionable.

98.     Defendants committed, or continued to commit, their antitrust violations within applicable periods of limitation. Defendants increased their prices and caused Plaintiff and other

Class members to pay supra-competitive prices because of those increases. Accordingly, Defendants committed overt acts in furtherance of their conspiracy and their antitrust violations within any applicable period of limitations. Therefore, Defendants committed a continuing violation of the antitrust laws.

99.    As described herein, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct and used pretextual justifications to justify their price increases. Furthermore, price-fixing conspiracies like Defendants' conspiracies are inherently self-concealing.

100.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statutes of limitations governing claims under the Sherman Act should be tolled pursuant to the doctrine of fraudulent concealment.

## VI. CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action for damages and injunctive relief on behalf of themselves and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3), with the Class initially defined to include ("the Class):

> All persons and entities in the United States and its territories that rented construction equipment directly from any of the Rental Defendants or their co-conspirators, or from any division, subsidiary, predecessor, agent, or affiliate of such Rental Defendant or co-conspirator, at any time during the period of at least March 31, 2021, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Class Period").

102.    This class definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, affiliates, or agents; (d) all governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f)

the judges and chambers staff in this case, as well as any members of their immediate families; and (g) all jurors assigned to this case.

103.    Plaintiff reserves the right to modify or amend the definition of the class before the Court determines whether certification is appropriate.

104.    **Numerosity.** The Class is so numerous and geographically dispersed across the United States that joinder of all members is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains tens of thousands of similarly situated proposed Class members. Class members are readily identifiable and are ones for which records should exist.

105.    **Common Questions Predominate**.: Numerous questions of law and fact are common to the Class related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

a.   whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Rental Equipment during the Class Period;

b.   whether such agreements constituted violations of the Sherman Antitrust Act;

c.   the identity of the alleged conspiracy's participants;

d.   the duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.   whether Defendants fraudulently concealed their misconduct;

f.   whether and to what extent Defendants' anticompetitive scheme inflated prices of Rental Equipment above competitive levels;

g.  the nature and scope of injunctive relief necessary to restore competition to the equipment rental market; and

h.  the measure of damages suffered by Plaintiff and the Class.

106.    These and other questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class. Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

107.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class. Plaintiff and other Class members were injured by the same unlawful conduct, which resulted in their paying more for Rental Equipment than they would have in a competitive market.

108.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff rented Rental Equipment directly from a Rental Equipment Defendant within the U.S. during the Class Period. Plaintiff has no material conflicts with any other members of the Class that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is adverse to the interests of other members of the Class, and the infringement of rights and damages Plaintiff sustained are typical of those of other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiff intends to prosecute this action vigorously.

109.    **Common Grounds for Injunctive Relief**: Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

110.    **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## VII. CLAIMS FOR RELIEF

## COUNT 1

## Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Restraint of Trade
### (On Behalf of a Nationwide Class)

111.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

112.     Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engaged in interstate commerce in renting Rental Equipment to Plaintiff and the Class.

113.     Beginning in or around 2011, Defendants entered into and engaged in a contract, combination, conspiracy, or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of Rental Equipment in the United States.

114.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for Rental Equipment in the United States.

115.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

    a.   exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Rental Equipment in the United States;

    b.   participating in meetings, conversations, and other communications among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of Rental Equipment in the United States;

    c.   participating in meetings, conversations, and other communications among themselves to implement, adhere to, and police the agreements they reached; and

    d.   engaging in conduct designed to raise and stabilize the prices of Rental Equipment.

116.     Defendants' acts in furtherance of their conspiracy included, but are not limited to the following:

    a.   Rouse created its RRI Price tool following the request of Defendants United Rentals, HERC Rentals, and H&E Equipment;

    b.   Rouse advertised and sold its pricing tool to other rental companies with intent to raise rental prices and achieve greater profits;

    c.   The Rental Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

    d.   the Rental Defendants charged customers for rental equipment at the RRI price set by Rouse's pricing tool; and,

    e.   Rouse empowered the Rental Defendants to enforce the collective Rouse prices.

117.    Defendants' conduct in furtherance of their unlawful scheme was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

118.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to fix, maintain, raise, or stabilize prices of Rental Equipment.

119.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, stabilize, and maintain the price of Rental Equipment.

120.    Defendants' conspiracy had the following effects, among others: (a) price competition in the market for Rental Equipment has been restrained, suppressed, and/or eliminated; (b) prices for Rental Equipment provided by the Rental Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; (c) Plaintiff and members of the Class who rented Rental Equipment from the Rental

Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) renters of Rental Equipment paid artificially inflated prices.

121.    Defendants' production restrictions, price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid in the United States for Rental Equipment in the United States.

122.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Rental Equipment purchased from the Rental Defendants and their co-conspirators than they would have paid in the absence of the conspiracy. As a direct and proximate result, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

123.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

124.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 26 of the Clayton Act (15 U.S. Code §§ 15 and 26).

## COUNT 2

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Conspiracy to Exchange Competitive Information
### (On Behalf of a Nationwide Class)

125.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

126.    Plaintiff pleads this legal theory separately and alternatively to the *per se* legal theory pled in Count 1, according to Federal Rule of Civil Procedure 8 (d)(2) and (3).

127.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engaged in interstate commerce in renting Rental Equipment to Plaintiff and members of the Class.

128.    Beginning in or around 2011, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information regarding Rental Equipment. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

129.    More specifically, Defendants' acts in furtherance of their conspiracy included, but are not limited to the following:

   a.   Rouse created its RRI Price tool following the request of Defendants United Rentals, HERC Rentals, and H&E Equipment;

   b.   Rouse advertised and sold its pricing tool to other rental companies with intent to raise rental prices and achieve greater profits;

   c.   The Rental Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

   d.   the Rental Defendants charged customers for rental equipment at the RRI price set by Rouse's pricing tool; and,

   e.   Rouse empowered the Rental Defendants to enforce the collective Rouse prices.

130.    Defendants' conduct in furtherance of their unlawful scheme was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

131.    The relevant market is the product market for Rental Equipment, and the relevant geographic market is the United States.

132.    Defendants' regular information exchanges though Defendant Rouse and its systems reflected an independent concerted action between and among horizontal competitors in the relevant market. Each Defendant voluntarily furnished competitively sensitive information with the understanding it would be reciprocated.

133.    Rouse enforced this understanding by requiring the Rental Defendants to share data to receive comparable data. The agreement to regularly exchange price, supply, inventory, and production information through Rouse's systems suppressed competition between the Rental Defendants and required the assistance of Rouse.

134.    The strategic information obtained through Rouse and its systems was a material factor in the decision to inflate prices for Rental Equipment during the Class Period.

135.    Defendants undertook this information exchange in furtherance of a price-fixing agreement, which is unlawful *per se*. Alternatively to Count 1's price-fixing claim, Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

136.    Defendants' information exchange has had the effects of: (1) reducing and suppressing competition among Defendants in the market for Rental Equipment; and (2) inflating the price of Rental Equipment during the Class Period. As a result of this conduct, Plaintiff and Class members have been injured in their business or property by paying artificially inflated prices for Rental Equipment during the Class Period.

137.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 26 of the Clayton Act (15 U.S. Code §§ 15 and 26).

## COUNT 3

### Unjust Enrichment (On Behalf of a Nationwide Class)

138.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

139.    Plaintiff pleads this legal theory separately and alternatively from the legal theories pled in Counts 1 and 2.

140.    Through Defendants' systematic exchange of competitively sensitive data, the Rental Defendants have artificially increased the price of Rental Equipment charged to Plaintiff and members of the Class.

141.    The Rental Defendants have collected artificially high rents for Rental Equipment from Plaintiff and members of the Class.

142.    The Rental Defendant shave been unjustly enriched by retaining the artificially high rents for Rental Equipment collected from Plaintiff and members of the Class.

143.    The retention of these rents by the Rental Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the Class.

### IX. PRAYER FOR RELIEF

144.    WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests that:

a.  The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

b.  The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their Co-Conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of antitrust and competition laws as alleged above;

c.  The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.  Awarding damages, including treble damages, for Defendants' violations of the Sherman Act (15 U.S.C. § 1);

e.  The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

    f.   The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## X. JURY TRIAL DEMANDED

145.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

DATED: July 2, 2025                         Respectfully submitted,

Seth R. Lesser (Bar No.: CT 27068)
Klafter Lesser LLP
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: 914 934 9200
Facsimile: 914 934 9220
seth@klafterlesser.com

David M. Cialkowski
(*pro hac vice application forthcoming*)
Ian F. McFarland
(*pro hac vice application forthcoming*)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
(612) 341-0400
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com

***Attorneys for Plaintiff***